**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **WHITEHARDT, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-01307** |
| | ) | **Judge Aleta A. Trauger** |
| **GORDON J. McKERNAN and** | ) | |
| **GORDON McKERNAN INJURY** | ) | |
| **ATTORNEYS, LLC f/k/a THE** | ) | |
| **McKERNAN LAW FIRM, PLLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Before the court is the Partial Motion to Dismiss (Doc. No. 31) filed by defendants

Gordon J. McKernan and Gordon McKernan Injury Attorneys, LLC, f/k/a The McKernan

Law Firm ("the Law Firm"). The defendants seek dismissal under Rule 12(b)(6) of the

plaintiff's claims of tortious interference (Count IV), unfair competition (Count V), and

violation of the Tennessee Consumer Protection Act ("TCPA") (Count VI), and a portion of

Plaintiff's copyright infringement claim (Count II). The motion has been fully briefed by

both parties and is ripe for review. For the reasons set forth herein, the motion will be granted

in part and denied in part.

**I.      BACKGROUND AND PROCEDURAL HISTORY**

For purposes of reviewing the defendants' motion, the court accepts as true the

factual allegations in the Amended Complaint, which is summarized, in relevant part,

hereafter.

Plaintiff Whitehardt, Inc. ("Whitehardt") is a Nashville-based advertising and consulting firm, specializing in law firm advertisements. The defendants, attorney McKernan and his law firm, specialize in personal injury litigation and are based in Baton Rouge, Louisiana. Whitehardt and the defendants first entered into an agreement for Whitehardt to provide advertising services for the defendants in early 2008. From the spring of 2008 through early 2015, Whitehardt created a series of advertisements and commercials for the defendants, designed to attract clients injured in tractor-trailer accidents. Most of these portrayed a lawyer standing or walking on top of a tractor-trailer. Whitehardt refers to these advertisements as the "Lawyer On The Truck" or "LOTT" campaign. The LOTT campaign was very successful and allowed the defendants to substantially increase their business in the area of tractor-trailer litigation.

Whitehardt registered the scripts and the motion pictures of the television advertisements it created in the LOTT campaign with the United States Copyright Office. The plaintiff refers to the copyright-protected works as the "LOTT Copyrighted Works."

Whitehardt conceived of and developed the LOTT campaign to be marketed, not only to the defendants, but also to attorneys in other jurisdictions who do not compete directly with the defendants. The defendants knew no later than September 17, 2013 that Whitehardt used the LOTT campaign for other personal injury lawyer clients in other jurisdictions. Shortly after receiving confirmation of that fact, the Law Firm filed trademark/service mark U.S. App. Ser. No. 86/073,127, which registered on May 6, 2014 as U.S. Reg. No. 4,525,497 (the "'497 Mark"). The '497 Mark consists of a portrait of McKernan standing on the hood of a truck. According to Whitehardt, the '497 Mark artwork is substantially derived from the LOTT Copyrighted Works and LOTT campaign. As part of the Law Firm's trademark

application, Robert C. Tucker, as the Law Firm's attorney of record, signed a declaration attesting that, to the best of his knowledge, "no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion . . . or to deceive. . . ." (Am. Compl. ¶ 52.)

On June 24, 2014, the Law Firm filed a trademark/service mark application, which was granted on February 3, 2015 and registered as U.S. Reg. No. 4,681,608 (the "'608 Mark"). The '608 Mark consists of the figure of a man dressed in a suit standing on top of a tractor-trailer. According to Whitehardt, the '608 Mark artwork is also substantially derived from Whitehardt's LOTT Copyrighted Works and LOTT campaign. In support of its trademark/service mark application, the Law Firm submitted a still screen-shot from "Big Truck – Come Out On Top," one of the Whitehardt television advertisements developed as part of the LOTT campaign.

In connection with the same application, Pam Jones, the Law Firm's Marketing Director, submitted a declaration attesting that, to the best of her knowledge, "no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive." (Am. Compl. ¶ 57.)

Since registering the '497 and '608 Marks, the Law Firm has filed two other trademark applications for marks derived from the LOTT Copyrighted Works and the LOTT campaign.

Whitehardt alleges that the defendants have used these trademark registrations to interfere with Whitehardt's business. Specifically, in late 2013, Whitehardt entered into a

written agreement, which the plaintiff characterizes as an Agency of Record agreement ("AOR Agreement"), with Andy Citrin, an Alabama personal injury lawyer. Pursuant to the AOR Agreement, Whitehardt agreed to provide advertising services for Citrin and granted Citrin a license to use Whitehardt's advertisements. The agreement prohibited Citrin from reselling any of the advertisements. McKernan had specific knowledge that Citrin and Whitehardt were working together, because McKernan provided advice to Citrin about obtaining the Alabama State Bar's approval of certain advertisements developed for Citrin by Whitehardt. In the course of their relationship, Whitehardt authored various LOTT commercials for Citrin.

On August 5, 2014, McKernan demanded that Citrin execute a Trademark License Agreement ("TLA"), in which the Law Firm purported to grant a non-exclusive license to Citrin to use the '497 Mark within Baldwin and Mobile Counties in Alabama and purported to give the defendants the right to terminate the non-exclusive license, without cause, upon six months' notice. When Citrin did not sign the TLA, McKernan followed up on his demand on May 14, 2015 with an email stating: "Andy, please email me your exact issues. We need to put this behind us. I don't have much room to give anymore." (Am. Compl. ¶ 66 and Ex. M, Doc. No. 27-13, at 2.) On May 18, 2015, McKernan sent an email to Citrin threatening to have his lawyer send a "cease and desist" letter if Citrin did not sign the TLA. This email was copied to the lawyer and to two Whitehardt representatives. (Am. Compl. ¶ 67 and Ex. N, Doc. No. 27-14, at 3.) As a result of McKernan's demands and threats in relation to the license agreement for use of LOTT advertisements, Citrin "is no longer using Whitehardt's services in multiple capacities, including without limitation for billboards or consulting services." (Am. Compl. ¶ 73.)

Whitehardt has demanded that defendants cease using any of Whitehardt's LOTT campaign advertisements or any derivation thereof, but they have continued to do so. Whitehardt asserts that defendants have willfully infringed Whitehardt's copyrights by improperly displaying the LOTT Copyrighted Works at least 9,674 times since May 22, 2015 in television advertisements. The defendants have also continued to display the LOTT Copyrighted Works on the defendants' website, YouTube channel, and various print outlets, including billboard advertisements. The defendants have infringed Whitehardt's copyrights by running advertisements based on other Whitehardt advertising campaigns. The plaintiff provides details regarding the number of times various copyright-protected materials have been improperly displayed by the defendants.

Whitehardt filed its original complaint in this action in November 2015. It filed its Amended Complaint in March 2016 in response to the defendants' first Partial Motion to Dismiss. The plaintiff asserts claims in the Amended Complaint for: (1) breach of contract (Count I); (2) copyright infringement (Count II); (3) false or fraudulent trademark registrations (Count III); (4) tortious interference with Whitehardt's contractual and business relationships with a third party (Count IV); (5) unfair competition (Count V); and (6) violation of the TCPA (Count VI).

The defendants have now filed their motion seeking dismissal of some of the claims in the Amended Complaint, specifically the claims for tortious interference, unfair competition, and TCPA violation, and a portion of the copyright infringement claim. The plaintiff filed a Response in Opposition to the Defendants' Partial Motion to Dismiss (Doc. No. 39), and the defendants have filed their Reply (Doc. No. 45).

## II.    LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action" but, instead, must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678– 79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## III.     ANALYSIS

The defendants argue that the plaintiff's claims of unfair competition, violation of the TCPA, and tortious interference should be dismissed because they are preempted by the Copyright Act, 17 U.S.C. § 301. The defendants also argue that, even if the claims are not

preempted, the plaintiff fails to allege sufficient facts to state a claim for unfair competition, violation of the TCPA, or tortious interference for which relief may be granted. In addition, the defendants contend that the portion of the plaintiff's copyright infringement claim relating to trademark registration is subject to dismissal, because the plaintiff admits in the Amended Complaint that the defendants were licensed to use the Copyrighted Works at the time that the relevant applications were filed and subsequently matured to registration.

### A. Preemption Under the Copyright Act

The Copyright Act provides protection for original works of authorship expressed in various media. 17 U.S.C. §§ 101–1332. Generally, the owner of a copyright has the exclusive rights to (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies; (4) perform publicly a copyrighted work; and (5) display publicly a copyrighted work. 17 U.S.C. § 106. A plaintiff may bring a claim against a person who infringes any of the plaintiff's exclusive rights in a copyright under § 106 by demonstrating "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

Under § 301(a) of the Copyright Act, a state law claim is preempted if: "(1) the work is within the scope of the 'subject matter of copyright,' as specified in 17 U.S.C. §§ 102, 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting 17 U.S.C. § 301(a)). "Courts and commentators have described this preemption analysis as encompassing a 'subject matter requirement' and a 'general scope' or 'equivalency' requirement." *Id.* (citing *Nat'l Basketball Ass'n v.*

*Motorola, Inc.*, 105 F.3d 841, 848 (2d Cir. 1997); 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ("Nimmer") § 1.01[B][1]–[2], at 1-10 to 1-57 (1999)).

The subject-matter requirement of § 301 is satisfied if a work fits within the general subject matter of §§ 102 and 103, regardless of whether it qualifies for copyright protection. *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004) (citations omitted). In *Wrench*, the Sixth Circuit, joining several other circuits, held that, for purposes of preemption, the scope of the Copyright Act's subject matter is broader than the scope of its protection. *Wrench*, 256 F.3d at 454–55.

To analyze equivalency, the court applies a "functional test" to determine whether the state law right at issue is equivalent to any of the exclusive rights under § 106. *Stromback*, 384 F.3d at 301 (citing *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994)). Under § 301(a), even if a party's "state law claims concern works within the subject matter of copyright, such claims will only be preempted if they assert rights that are 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106[.]'" *Wrench*, 256 F. 3d at 455–56 (quoting 17 U.S.C. § 301(a)). "Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights." *Id* at 456. If, however, "an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is *qualitatively different* from a copyright infringement claim." *Id.* (emphasis added) (citations omitted). The existence of an extra element precludes preemption only where the element changes the nature, rather than the scope, of the action. *Data Gen.*, 36 F.3d at 1164–65.

For purposes of determining equivalency, and specifically whether the state law claim includes an "extra element," the court may be required to look at the facts as pleaded by the plaintiff as well as the elements of the cause of action, "in order to determine whether the acts giving rise to the state law claim are merely acts of copyright infringement." *Stromback*, 384 F.3d at 301 (citing *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1304 (D.C. Cir. 2002)).

### 1.    *Unfair Competition*

Although Tennessee law regarding unfair competition is not well developed, it appears that the tort generally arises in the context of trademark infringement and, in that context, requires three elements: "(1) the defendant engaged in conduct which 'passed off' its organization or services as that of the plaintiff; (2) in engaging in such conduct, the defendant acted with an intent to deceive the public as to the source of services offered or authority of its organization; and (3) the public was actually confused or deceived as to the source of the services offered or authority of its organization." *Sovereign Order of Saint John of Jerusalem, Inc. v. Grady*, 119 F.3d 1236, 1243 (6th Cir. 1997) (citations omitted); *see also Frisch's Restaurants, Inc., v. Elby's Big Boy*, 849 F.2d 1012, 1015 (6th Cir. 1998) (facts that support claim for trademark infringement also support unfair competition claim). [1]

The plaintiff avers, in support of its unfair competition claim, that

(1) "[a]s part and parcel of Whitehardt and Defendants' agreement, Defendants agreed that they would not, without Whitehardt's permission, use Whitehardt's creative products with respect to advertising services Whitehardt

---

[1] In *B&L Corp. v. Thomas & Thorngren, Inc.*, 917 S.W.2d 674 (Tenn. Ct. App. 1995), the court recognized a tort of unfair competition in the context of an employee's alleged use of confidential and proprietary business information, to the detriment of his former employer. The court identified "unfair competition" as "a generic name for several related torts involving improper interference with business prospects." *Id.* at 681 (citing Prosser and Keeton on the Law of Torts § 130 at 1013 (5th ed. 1984)).

provided, including but not limited to the campaigns related to the Copyrighted Works" (Am. Compl. ¶ 117);

(2) the defendants "passed off" Whitehardt's work as their own by incorporating the LOTT Copyrighted Works into the '497 and '608 Marks;

(3) the defendants acted with an intent to deceive and did actually cause confusion, specifically with respect to Citrin; and

(4) the defendants have harmed Whitehardt's ability to market the LOTT campaign.

(*See* Am. Compl. ¶¶ 117–22.)

The defendants assert that the unfair competition claim is "really just a copyright claim posing as a tort claim." (Doc. No. 32, at 14.) The plaintiff, in response, argues that the subject matter of this claim is defendants' "improper conduct with respect to Citrin and [the defendants'] Trademark License Agreement, not Whitehardt's copyrighted materials," that the claim does not "allege that [the defendants] infringed on Whitehardt's copyrights" but instead alleges that the defendants "attempted to force a Whitehardt customer (Citrin) to pay for a license with respect to [the defendants'] trademarks and that this—not [the defendants'] copyright infringement—has caused Whitehardt to lose business." (Doc. No. 39, at 11–12.)

The Amended Complaint clearly attempts to frame the unfair competition claim as grounded in "passing off." The "essence" of a "passing off" claim "is false representation of origin." *Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 933 (S.D.N.Y. 1996). Caselaw distinguishes, however, between true passing off claims and "reverse passing off." *See, e.g.*, *Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F. Supp. 2d 291, 297 (S.D.N.Y. 2007). In a true passing off situation, the alleged infringer sells its own products as the plaintiff's. *Id.* An unfair competition claim arising from that situation would not involve alleged copyright infringement and would not be preempted by § 301 of the Copyright Act. In a reverse passing off situation, the alleged infringer sells the plaintiff's

products as its own. *Id.*; *Am. Movie Classics*, 922 F. Supp. at 934. Claims predicated on a

theory of reverse passing off may be preempted by § 301. *See, e.g.*, *Am. Movie Classics*, 922

F. Supp. at 934 ("Rather, if any unfair competition claim is asserted, it is of the "reverse

passing off" variety—i.e., that Turner Classic took goods of another and passed them off as

Turner Classic's own. A claim that a defendant has reproduced the plaintiff's work and sold

it under the defendant's name—even if denominated "passing off" by the plaintiff—is

preempted by the Copyright Act.").

> Professor Nimmer explains the distinction:
>
> If A claims that B is selling B's products and representing to the public that
> they are A's, that is passing off. If, by contrast, B is selling B's products and
> representing to the public that they are B's [when presumably they are A's],
> that is not passing off. A claim that the latter activity is actionable because B's
> product replicates A's, even if denominated "passing off," is in fact a
> disguised copyright infringement claim, and hence preempted.

1 Nimmer on Copyright § 1.01[B][1][e], at 1-25 n.110, *quoted in Am. Movie Classics*, 922 F.

Supp. at 934. Here, Whitehardt does not claim that defendants are selling their own product

(or services) and representing that they are actually Whitehardt's. Instead, Whitehardt alleges

that the defendants are attempting to sell the defendants' product (by licensing their

trademarks to others, including Citrin) and representing to the public (specifically Citrin) that

the trademarks are valid and belong to the defendants, when, according to Whitehardt, the

trademarked material is derivative of Whitehardt's Copyrighted Works. This fact pattern

closely matches Nimmer's description of reverse passing off.

The plaintiff tries to avoid the result of this conclusion by asserting that the subject

matter of its claim is not the copyrighted material but the defendants' TLA and "whether

[that agreement] harmed Whitehardt's business." (Doc. No. 39, at 13.) The court finds that

this is a distinction without a difference. The claim is premised upon the defendants' attempt to pass off the plaintiff's copyrighted material as its own.

Nor has the plaintiff identified any "extra element" of the claim that would enable it to avoid preemption. Although it alleges that the defendants falsely represented to Citrin that they own valid rights in the trademarks at issue, such allegations do not "change[] the nature of the action so that it is *qualitatively different* from a copyright infringement claim." *Wrench*, 256 F.3d at 456. In fact, those false assertions are what makes this a reverse passing off claim. *See* Nimmer, *supra*.

In short, the court finds that this claim is preempted by the Copyright Act and subject to dismissal on that basis.

### 2.     The TCPA

To state a claim under the TCPA, the plaintiff must allege facts showing that: (1) the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) the defendant's conduct caused an 'ascertainable loss of money or property, . . . or thing of value . . . .'" *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)). Whitehardt, in support of its TCPA claim, asserts that the defendants engaged in unfair or deceptive acts or practices by "passing off services and/or causing a likelihood of confusion or of misunderstanding as to the services being offered." (Am. Compl. ¶ 124.)

This claim is preempted for the same reasons that the unfair competition claim is preempted: it is, in essence, a reverse passing off claim, not a true passing off claim. Moreover, the additional element of likelihood of confusion does not render the claim qualitatively different from a copyright claim. *Cf. Patel v. Hughes*, No. 3:13-0701, 2014 WL

4655285, at *8 (M.D. Tenn. Sept. 16, 2014) ("TCPA claims that allege 'Defendant created confusion as to the source of the ideas and techniques that were produced' and that 'lead consumers to believe these were Defendant's ideas and work,' are 'precisely equivalent to the rights' protected under the Copyright Act." (quoting *Hamlin v. Trans–Dapt of Cal., Inc.*, 584 F.Supp.2d 1050, 1061 (M.D. Tenn. 2008)).

This claim, too, will be dismissed as preempted by the Copyright Act.

### 3.    *Tortious Interference*

The Sixth Circuit has recognized that, "[g]enerally, tortious interference claims (with contract or prospective economic advantage) are held to be preempted [by the Copyright Act] because the rights asserted in such claims are not qualitatively different from the rights protected by copyright." *Stromback*, 384 F.3d at 306. Nimmer also recognizes that,

> [i]nsofar as unauthorized reproduction, distribution, performance or display causes the plaintiff to lose the benefits that would flow from an actual or prospective contract whereby plaintiff would authorize any such acts, the rights created by the tort of contract interference do not appear to differ qualitatively from rights under copyright; copyright also contemplates loss of actual or prospective contract benefits by reason of such unauthorized acts. Pre-emption in this context would, then, appear to be justified.

1 Nimmer § 1.01[B][1][a] (footnotes omitted).

In a typical case holding that a tortious interference claim is preempted by the Copyright Act, the subject matter of the claims is clearly the copyrighted work. In *Stromback*, for example, the plaintiff asserted that he had a "legitimate expectation of a future economic benefit from the development of his [copyrighted] poetry and screenplay"; that the defendant "knew that the use of [the plaintiff's] poem and screenplay would interfere with [his] reputation and [its] development . . . within the film industry"; and that the defendant's misappropriation of various elements of the copyrighted materials "were made

with the intent that [the plaintiff's] expected relationships would be destroyed." *Stromback*, 384 F.3d at 306. *See also Masck v. Sports Illustrated*, No. 13-10226, 2013 WL 2626853, at *5 (E.D. Mich. June 11, 2013) (finding the plaintiff's tortious interference claim was preempted because the plaintiff failed to demonstrate that the tortious interference claim was "qualitatively different from the copyright action," where the alleged "interference" consisted of the defendant's unauthorized copying of a photograph, "the exact conduct complained of in Plaintiff's copyright claims").

Here, the subject matter of the plaintiff's claim of tortious interference is, ostensibly at least, Whitehardt's business relationship with attorney Andy Citrin, specifically Citrin's engagement of Whitehardt for consulting and advertising services. The arrangement between Citrin and Whitehardt was not simply an agreement for licensing Whitehardt's Copyrighted Works, but an ongoing relationship for providing advertising services generally. Whitehardt does not expressly allege, as an element of the claim, that either Citrin or the defendants infringed the plaintiff's copyrights, and it does not purport to seek damages related to infringement of its copyrights. Whitehardt asserts that:

> (1) Whitehardt and Citrin had an ongoing business relationship, documented by the AOR Agreement, pursuant to which Whitehardt would provide advertising and consulting services for Citrin;
>
> (2) the defendants were aware of that relationship;
>
> (3) "[a]rmed with this information" (Am. Compl. ¶ 112), the defendants tortiously interfered with that relationship by attempting to have Citrin execute the TLA and by threatening him with the risk of litigation if he refused to sign the license agreement; and
>
> (4) in doing so, the defendants caused Citrin to modify and narrow his relationship with Whitehardt, causing financial injury to Whitehardt.

(*See* Am. Compl. ¶¶ 110–14.)

The preemption issue as related to this claim presents a very close call. On one level, the claim could be construed as arising from the defendants' act of registering a trademark that infringes upon the plaintiff's copyright. Viewed in that light, the defendants' attempts to have Citrin sign the TLA represent an infringement of the plaintiff's right to authorize the use and copying of its copyright-protected works. In this case, however, the rights the plaintiff seeks to vindicate in the tortious interference claim are not "precisely equivalent to the rights he seeks to vindicate under the Copyright Act." *Hamlin v. Trans-Dapt of Cal., Inc.*, 584 F. Supp. 2d 1050, 1061 (M.D. Tenn. 2008). The rights at issue are not only the plaintiff's rights to reproduce and distribute copyrighted works and to prepare derivative works. The tortious interference claim also concerns a more general right to represent Citrin and to perform services on Citrin's behalf in the arena of advertising. The relationship extended beyond Citrin's use of Whitehardt's copyrighted works and derivations thereof. Further, the conduct complained of—wrongfully threatening litigation—goes beyond simply copying or using the plaintiff's Copyrighted Works. *Accord Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1305 (D.C. Cir. 2002) ("Although tortious interference with contract claims are typically found preempted . . . , a different result is warranted where the defendant interferes with the plaintiff's contractual rights through conduct other than "reproduction[,] . . . preparation[,] . . . distribution[,] . . . performance[,] . . . or display" of the copyrighted work." (citing 17 U.S.C. § 106) (most alterations in original)).

For purposes of the motion to dismiss, the court finds that the tortious interference claim is not preempted by the Copyright Act.

**B.      Failure to State a Claim—Tortious Interference with Contract or Business Relations**

Having concluded that the tortious interference claim is not preempted, the court must address the defendants' argument that the complaint fails to allege sufficient facts to state a colorable claim for tortious interference with contract or tortious interference with a business relationship.[2]

### *1.      Tortious Interference with Contract*

A claim for tortious interference with contract (also called inducement to breach a contract) under Tennessee law requires a plaintiff to allege and establish the following elements:

> (1) that a legal contract existed; (2) that the defendant was aware of the contract; (3) that the defendant intended to induce a breach of that contract; (4) that the defendant acted with malice; (5) that a breach of the contract occurred; (6) that the breach was a proximate result of the defendant's conduct; and (7) that the breach injured the plaintiff.

*Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 405 (Tenn. 2002); *Green v. Champs-Elysees, Inc.*, No. M2012-00082-COA-R3-CV, 2013 WL 10481171, at *7 (Tenn. Ct. App. Sept. 11, 2013). The defendants assert that the Amended Complaint fails to state a claim for tortious interference with contract because it does not allege that a contract has been breached.

The complaint alleges the existence of a written contract between Whitehardt and Citrin: the Agency of Record agreement ("AOR Agreement") in which "Citrin provided Whitehardt with the authority to represent Citrin in all media negotiations and placements." (Am. Compl. ¶ 60.) The Amended Complaint does not allege the existence of any other form

---

[2] Because the court has found that the claims of unfair competition and TCPA violation are preempted, the court declines to address the defendants' other arguments for dismissal of those claims.

of contract between Citrin and Whitehardt. The Amended Complaint describes the AOR Agreement as giving Citrin a license to use Whitehardt's advertisements and prohibiting Citrin from reselling any of the advertisements made for him by Whitehardt. (Am. Compl. ¶ 61.) The Amended Complaint does not allege that the AOR Agreement is exclusive or that it requires Citrin to employ any particular advertising services for any definite period of time.

Moreover, the Amended Complaint does not allege that Citrin violated the AOR Certification (or Agreement) or any other form of agreement between Citrin and Whitehardt. It simply alleges that, under pressure from defendants, Citrin ceased "using Whitehardt's services in multiple capacities, including without limitation for billboards or consulting services," thus damaging Whitehardt's business. (Am. Compl. ¶ 73.) Because the Amended Complaint does not allege that Citrin was contractually required to use Whitehardt's services for billboard or consulting services, it fails to state a colorable claim for inducement to breach a contract or tortious interference with a contract.

### 2. *Tortious Interference with Business Relationship*

A claim of tortious interference with a business relationship has the following elements under Tennessee law:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (citations and emphasis omitted). The defendants assert that the Amended Complaint fails to state a tortious

interference claim because it does not allege that the defendants *intended* to cause a breach or termination of the relationship between Citrin and Whitehardt.

The defendants rely on *Overnite Transportation. Co. v. Teamsters Local Union No. 480*, No. M2002-02116-COA-R3-CV, 2004 WL 383313 (Tenn. Ct. App. Feb. 27, 2004). In *Overnite*, the complaint stated that "Defendants' misconduct was intentional and interfered with the employment relationship between Overnite and its employees by adversely impacting the safe work environment that Overnite maintains for its employees." *Id.* at *13. The *Overnite* court reasoned that the complaint failed to state a cause of action for tortious interference because the complaint alleged only that the intentional conduct—violent and disruptive picketing by union members that was intended to intimidate Overnite employees who crossed the picket line to work—incidentally affected Overnite's relationships with its employees; the complaint did not actually allege that the defendant intentionally caused a breach in Overnite's business relationships. *See id.* ("In our view, however, the allegation that the Union's conduct 'was intentional' does not satisfy the requirement of alleging that the Union intended to cause a breach in the business relationship at issue. Rather, Overnite must allege that the Union intentionally caused a breach in Overnite's relationships.").

It is clear, as a matter of Tennessee law, that a plaintiff asserting a claim of intentional interference with business relations must allege facts that, if true, would permit a factfinder to conclude that the defendant intended to interfere with the plaintiff's business relations. *See, e.g.*, *Tennison Bros., Inc. v. Thomas*, No. W2013-01835-COA-R3CV, 2014 WL 3845122, at *13 (Tenn. Ct. App. Aug. 6, 2014) ("As set out in its order, *supra*, the trial court stated that 'Tennison must show that the predominant intent of Thomas's actions were [sic] to cause the breach or termination of Tennison's business relationship with Clear Channel.' This is

correct."). *Accord Assist-2-Sell, Inc. v. Assist-2-Build, LLC*, No. 1:05-CV-193, 2005 WL 3333276, at *4 (E.D. Tenn. Dec. 6, 2005) (denying in part a motion to dismiss tortious interference claim, noting that, unlike in *Overnite*, the counterclaimants "specifically allege[d] that [the counterdefendants] intentionally interfered with their business relations" by disrupting an open house and removing signs, but that the counterdefendants' filing of a lawsuit did not constitute tortious interference where the allegations in the counterclaim did not allege or imply that the counterdefendants' intent in filing the original complaint was to interfere with the counterclaimant's business relations). *See also Shaker v. Vill. Voice Media, Inc.*, No. 1:04-CV-01881, 2005 WL 1277730, at *3 (N.D. Ohio May 26, 2005) (dismissing intentional interference with business relations claim under Ohio law because the plaintiffs stated that the defendants' conduct (alleged antitrust violations) was "willful, wanton, reckless and/or malicious" but did not allege that the defendant intended to cause the termination of the plaintiffs' employment).

In the case at bar, the Amended Complaint does not expressly allege that the defendants intended to interfere with the business relationship between Whitehardt and Citrin. For purposes of the defendants' motion to dismiss, however, the court must construe the complaint in the light most favorable to the plaintiff, accept all well pleaded factual allegations as true, and draw "all reasonable inferences" in the plaintiff's favor. *See, e.g.*, *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 707 (6th Cir. 2015) (citations omitted). The question presented here is whether the reasonable inferences to be drawn from the complaint are sufficient to establish that the defendants intended to interfere with the plaintiff's business relationship.

In that regard, the Amended Complaint alleges that, in August 2014, the defendants "demanded" that Citrin sign the TLA specifically pertaining to the trademarked image of Gordon McKernan standing on the hood of a truck. (Am. Compl. ¶ 64.) When Citrin did not sign the TLA, McKernan followed up months later with an email dated May 14, 2015 stating: "Andy, please email me your exact issues. We need to put this behind us. I don't have much room to give anymore." (Am. Compl. ¶ 66 and Ex. M, Doc. No. 27-13, at 2.) On May 18, 2015, McKernan sent another email to Citrin, copied to two Whitehardt employees, complaining, "this continues to drag on and cost me money," and notifying Citrin: "if we can't reach an agreement by this Friday, I am asking my lawyer (who I have copied) to send a cease and desist letter." (Am. Compl. ¶ 67 and Ex. N., Doc. No. 27-14, at 3.) Citrin responded to McKernan, stating that he had expected McKernan and a Whitehardt representative to discuss the matter and explaining:

> I am not being stubborn or unfocused. I am just confused. . . . Between my conversations with Kevin [at Whitehardt] and you, I can't make heads or tails out of the plan. I have an agreement from you and another one from [Whitehardt]. I am getting mixed messages. What do you suggest I do? I want to sign your agreement and resume our good relations. My only change to your proposal is that I want to split the cost of pursuing infringers 50/50 – so we both have equal skin in the game. . . . May we speak [on the phone]? All of us?

(Am. Compl. ¶ 68 and Ex. N, Doc. No. 27-14, at 2–3.)

McKernan responded that the problem with Citrin's proposed 50/50 split was that Citrin would be "making all the fee money and only paying 1,500 dollars a year," presumably for the license to use the defendants' trademark. (Am. Compl. Ex. N, Doc. No. 27-14, at 2.) He proposed that "we split fees on all 18 wheelers and I help finance that," in which case "50-50 for infringers might work." (*Id.*) Whitehardt describes this response as

"further entice[ment of] Citrin" to sign the TLA. (Am. Compl. ¶ 69.) Whitehardt further alleges that:

> 72.     McKernan was forcing Citrin, a Whitehardt's [sic] customer, to either accept McKernan's unlawful "Trademark License Agreement" or run the risk of litigation—even though Citrin had already paid for a license from Whitehardt to lawfully use the LOTT Copyrighted Works.
>
> 73.     As a direct result of McKernan's tortious interference, Whitehardt's business has been damaged. For example, Citrin is no longer using Whitehardt's services in multiple capacities, including without limitation for billboards or consulting services.

(Am. Compl. ¶¶ 72–73.)

In other words, the Amended Complaint clearly alleges an existing business relationship between Whitehardt and Citrin, the defendant's specific knowledge of that relationship, and also financial damages to the plaintiff resulting from an alteration or partial breach of that relationship. Further, the Amended Complaint implies improper means or improper motive, insofar as Whitehardt claims that the defendants' trademark registrations were fraudulently obtained and that the defendants improperly threatened litigation if Citrin did not sign the TLA. The use of improper means suggests an improper motive: intent to interfere with the relationship between Citrin and Whitehardt. In addition, the allegations that Whitehardt representatives were copied on the emails from McKernan to Citrin and that McKernan was aware of Citrin's confusion strengthen the implication that the defendants intended to interfere with Whitehardt's relationship with Citrin.

Although the Amended Complaint does not actually state, in so many words, that McKernan's actions were taken for the purpose of interfering with Whitehardt's relationship with Citrin, the expressly stated facts and the attached exhibits give rise to a reasonable inference of intentional interference. The motion to dismiss this claim will be denied.

### C.       Failure to State a Claim—Copyright Infringement

The copyright infringement claim set forth in Count II of the Amended Complaint is based, at least in part, on Whitehardt's allegation that the defendants

> infringed the LOTT Copyrighted Works by copying and incorporating the LOTT Copyrighted Works and derivative works thereof, including but not limited to into Defendants' '497 and '608 Marks, which are substantially similar to and/or unauthorized derivatives of Whitehardt's LOTT Copyrighted Works.

(Am. Compl. ¶ 95.) The defendants assert that, to the extent the copyright infringement claim is based on the defendants' allegedly incorporating the plaintiff's Copyrighted Work into the defendants' trademark registrations, the claim must be dismissed under Rule 12(b)(6), because the plaintiff admits that the defendants were authorized to use the LOTT Copyrighted Works at the time the trademark applications were filed and registered. (Doc. No. 32, at 31.)

In response, the plaintiff argues that, even assuming that the defendants had an express or implied license to use the plaintiff's Copyrighted Works in some contexts, such as in advertising, the defendants "had no right to secretly use a still screen-shot from one of Whitehardt's copyrighted commercials to obtain a federal trademark." (Doc. No. 39, at 33.) The law supports the plaintiff's position. *See, e.g.*, *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010) ("Implied licenses [to use a copyrighted work] may be limited and a defendant who exceeds the scope of an implied license commits copyright infringement.").

The court finds that, for purposes of Rule 12(b)(6), the Amended Complaint adequately states a claim for copyright infringement based on the defendants' copying and

incorporating the LOTT Copyrighted Works and derivative works into Defendants' the '497 and '608 Marks.

## IV. CONCLUSION

For the reasons set forth herein, the court will grant the defendants' motion to dismiss the plaintiff's claims of unfair competition (Count V) and violation of the TCPA (Count VI), as preempted by the Copyright Act, and will grant the motion to dismiss the claim of tortious interference with contract for failure to state a claim for which relief may be granted. In all other respects, the motion will be denied.

An appropriate order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge